**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br><br>v.<br><br>ALEXANDER PENA,<br>*Defendant*. | No. 3:17-cr-00150 (VAB) |

**RULING AND ORDER ON MOTION FOR COMPASSIONATE RELEASE**

Alexander Pena ("Defendant") has moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mot. for Reduction of Sentence Under First Step Act: Compassionate Release, ECF No. 641 (Dec. 18, 2020) ("Def.'s Mot."); Mem. in Supp. of Mot. for Reduction of Sentence Under First Step Act: Compassionate Release, ECF No. 642 (Dec. 18, 2020) ("Def.'s Mem.").

The United States (the "Government") opposes his motion. Gov'ts Mem. in Opp'n to Def.'s Mot. for Compassionate Release, ECF No. 652 (Jan. 19, 2021) ("Gov't Opp'n").

For the reasons set forth below, Mr. Pena's motion for compassionate release is **GRANTED**.

Mr. Pena's term of imprisonment is reduced to **TIME SERVED**, followed by a period of four (4) years of supervised release, to be served in home incarceration for thirty (30) days, after which, if successfully completed, he may be eligible for home detention or curfew, until **September 2, 2022**. Mr. Pena shall be released from Bureau of Prisons custody by **February 12, 2021**, in accordance with the terms of this Order.

## I. BACKGROUND

On July 12, 2017, a grand jury returned a multi-count indictment against Mr. Pena and thirteen co-conspirators. Indictment, ECF No. 14 (July 12, 2017). The indictment charged Mr.

Pena with one count for conspiracy to distribute and to possess with intent to distribute heroin and fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), 841(b)(1)(A)(vi), and 846, *id.* ¶¶ 1-6; a second count for possession with intent to distribute and distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2, *id.* ¶ 9; a third count for possession with intent to distribute and distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), *id.* ¶ 10; a fourth count for possession with intent to distribute heroin and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), *id.* ¶ 32; and a fifth count for possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(2), *id.* ¶ 33. At the time of Mr. Pena's involvement in the conspiracy, he was on federal supervised release as a result of a prior conviction in the United States District Court for the Northern District of New York, supervision which had been subsequently transferred to this District. *See* Probation Transfer of Jurisdiction, *United States v. Pena*, No. 3:16-cr-00171-VAB-1, ECF No. 1 (Sept. 14, 2016).

On December 9, 2019, Mr. Pena pled guilty to a lesser included offense of Count One of the Indictment, conspiracy to distribute and to possess with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i), and 846. Plea Agreement, ECF No. 450 (Dec. 9, 2019).

On March 6, 2020, the United States Probation Office submitted a report of violation of supervised release based on Mr. Pena's involvement in the drug conspiracy during his time in supervision. Report on Violation of Supervised Release, *Pena*, No. 3:16-cr-00171-VAB-1, ECF No. 7 (Mar. 6, 2020).

On March 10, 2020, the Court sentenced Mr. Pena to a term of imprisonment of 75 months, a term of supervised release of four years, and a special assessment of $100.00. Min. Entry, ECF

No. 501 (Mar. 10, 2020); J., ECF No. 507 (Mar. 12, 2020).

The same day, the Court revoked Mr. Pena's supervised release and sentenced him to an additional 12 months of imprisonment for violating his conditions of release, to run consecutive to his 75-month term in the underlying offense. Min. Entry, *Pena*, No. 3:16-cr-00171-VAB-1, ECF No. 9 (Mar. 10, 2020); Corrected Order, *id.*, ECF No. 10-1 (Mar. 11, 2020).

On December 18, 2020, Mr. Pena moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Def.'s Mot; Def.'s Mem.

On January 19, 2021, the Government opposed Mr. Pena's motion. Gov't Opp'n.

The same day, this Court held a telephonic hearing on the motion. Min. Entry, ECF No. 656 (Jan. 19, 2021).

On January 22, 2021, Mr. Pena filed a supplemental memorandum in support of his motion. Def.'s Reply Mem. in Supp. of Mot. for Reduction of Sentence Under First Step Act: Compassionate Release, ECF No. 653 (Jan. 22, 2021) ("Def.'s Suppl. Mem.").

The same day, Mr. Pena filed a motion for compassionate release in his companion docket, arguing that the Court should consider relief as to both the sentence resulting from Mr. Pena's underlying offense and the sentence resulting from his supervised release violation in a consolidated manner, and incorporating by reference arguments made in his original motion for release. Mot. for Reduction in Sentence Under First Step Act: Compassionate Release, *Pena*, No. 3:16-cr-00171-VAB-1, ECF No. 16 (Jan. 22, 2021) ("Def.'s Second Mot."). Also, that same day, the Court gave the Government until January 29, 2021, to file any response to the motion. Order, *id.*, ECF No. 17 (Jan. 22, 2021).

On January 29, 2021, on this docket, the Government filed a supplemental memorandum in opposition to Mr. Pena's motion for compassionate release. Gov't Suppl. Mem. in Opp'n to

Def.'s Mot. for Compassionate Release, ECF No. 660 (Jan. 29, 2021) ("Gov't Suppl. Opp'n").

On February 8, 2021, Mr. Pena filed a second supplemental memorandum in support of his motion. Reply Mem. in Supp. of Mot. for Reduction of Sentence Under First Step Act: Compassionate Release, ECF No. 665 (Feb. 8, 2021).

## II. STANDARD OF REVIEW

A court may modify a term of imprisonment on compassionate release grounds in two circumstances: (1) "upon motion of the Director of the Bureau of Prisons [("BOP")];" or (2) "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . ." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020) ("In December 2018, as part of the First Step Act, Congress worked a change to th[e] rule of long standing" that a court could only modify a sentence upon motion from the Bureau of Prisons. "A court may now consider a motion for compassionate release made by a defendant who has exhausted his administrative remedies by petitioning the Director of the BOP to make such a motion, assuming the Director fails to act on the inmate's request within thirty days.").

A court may only grant such a modification if it finds that "extraordinary and compelling reasons warrant" release. 18 U.S.C. § 3582(c)(1)(A). In determining whether to grant a motion to modify a sentence, a court must also consider the factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(1)(A).

## III. DISCUSSION

Section 3582(c)(1)(A) authorizes courts "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for

compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *see United States v. Gonzalez*, No. 3:15-cr-00223 (MPS), 2020 WL 5793304, at *1 (D. Conn. Sept. 29, 2020) (slip op.) ("[B]ecause [Mr.] Gonzalez – and not the [BOP] – brings the instant motion, [the Court is] not bound by the Sentencing Commission's outdated policy statement applicable to Section 3582(c)(1)(A) . . . , which the Second Circuit recognized as only applying to motions for sentence reduction brought by the BOP.") (citing *Brooker*, 976 F.3d at 230) (internal citations omitted).

Mr. Pena argues that extraordinary and compelling reasons for release exist because he has "serious known risk factors for an adverse result if he becomes infected with COVID-19," Def.'s Mem. at 15 (emphasis omitted), specifically that he is "obese," *id.*, and that he has "essential (primary) hypertension, or high blood pressure," *id.* at 16. He argues that these conditions put him at "a significantly greater risk of severe complications if he contracts COVID-19." *Id.* at 17. He argues that at the time of filing the motion, there were 97 active inmate cases of COVID-19 at his facility, Danbury Federal Correctional Institution ("FCI Danbury").[1] *Id.* at 13.

With respect to the § 3553(a) factors, Mr. Pena argues that "the overriding factor . . . that was not present at the time of sentencing is the COVID-19 pandemic, the serious risk it presents to a person in Pena's condition, the harsh conditions he has faced, and the fact that programming has either been precluded or limited" in BOP facilities. *Id.* at 18. Mr. Pena argues that at FCI Danbury, programming is particularly limited, and that though he is enrolled in the RDAP program, recommended in his Presentence Report, it may not be possible for Mr. Pena to complete

[1] As of the date of this Order, there were two active inmate cases, and zero active staff cases, of COVID-19 at FCI Danbury. *See* Bureau of Prisons ("BOP"), *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Feb. 9, 2021).

the program before his release given the difficulties posed by COVID-19. *Id.* at 22. He argues further that during his time in custody, he has had no disciplinary infractions, and while incarcerated at his previous facility, he took several courses, including those pertaining to anger management and substance abuse, all of which he argues weighs in favor of release. *Id.* at 21. He also notes that he has already "served the majority of his sentence, and if he is likely to receive the significant programming that will help him to reintegrate into society, that is not likely to be in BOP custody," and suggests that he would be "more likely to be able to participate in needed counseling, on a consistent basis, on supervised release." *Id.* at 24. Specifically, Mr. Pena notes that his release date is September 2, 2022, and he "would be eligible for a halfway house September 2, 2021, due to his participation in the RDAP program."[2] Def.'s Suppl. Mem. at 3. He proposes release to the home of his cousin in Hartford, Connecticut. Def.'s Mem. at 24.

The Government opposes Mr. Pena's motion. Gov't Opp'n. The Government does not object to Mr. Pena's claims that he is obese or suffers from hypertension, or that those conditions place him at greater risk of severe illness should he contract COVID-19, but instead argues that Mr. Pena has not shown extraordinary and compelling reasons for release because "there is no indication that FCI Danbury is not able to appropriately care for and manage [Mr.] Pena's medical conditions and help keep him safe." Gov't Opp'n at 17; *see also id.* at 6-8 (outlining the BOP's efforts to safeguard inmates and their plan to roll out vaccinations); Gov't Suppl. Opp'n at 2-3 (specifically discussing infection control practices and vaccination rollout plans at FCI Danbury).

The Government instead focuses its opposition primarily on the § 3553(a) factors. Gov't Opp'n at 9-16. The Government argues that the circumstances of Mr. Pena's underlying offense,

[2] Though the Government states in its opposition that Mr. Pena is scheduled for release on September 2, 2023, Gov't Opp'n at 2, the BOP's website identifies Mr. Pena's release date as September 2, 2022. Bureau of Prisons, Inmate Locator, https://www.bop.gov/inmateloc/ (last accessed Feb. 9, 2021).

including that he was "directly involved in acquiring, processing, packaging and selling kilogram quantities of heroin and fentanyl," *id*. at 10; "was a significant member of th[e] [drug conspiracy]," which was responsible for distributing "extremely large quantities" of "incredibly addictive and destructive opioids that have destroyed" many lives, *id*. at 12; and "was involved in [the drug conspiracy] over a lengthy period of time," *id*., weighs against release.

The Government also argues that Mr. Pena's history and characteristics do not support a sentence reduction. *Id*. at 12-15. The Government concedes that Mr. Pena has "held a number of lawful jobs," "has no apparent mental health issues," and "has been in a long-term relationship." *Id*. at 12-13. The Government, however, also notes that Mr. Pena has a prior history of criminal activity, including a charge of transporting unstamped cigarettes across state lines, for which he was sentenced to one year's imprisonment, *id*. at 13 (citing Presentence Report, ECF No. 491 ¶ 35 (Feb. 21, 2020) ("PSR")); a charge of "[f]alse [p]retense," *id*. (citing PSR ¶ 40); a charge of driving with a suspended license, *id*. (citing PSR ¶ 41); and a charge of unlawful transportation of an alien within the United States, for which he was sentenced to time served and two years of federal supervised release, *id*. (citing PSR ¶ 36). In the Government's view, the fact that Mr. Pena participated in the underlying drug conspiracy while on supervised release also weighs against release. *Id*. at 13-14.

The Government also argues that Mr. Pena has already received a "huge break" in his sentence, as the Court's sentence was significantly below the Guidelines range, *id*. at 14, and that it is necessary for Mr. Pena to serve his full sentence to reflect the seriousness of the offense and avoid unwarranted sentence disparities between himself and other similarly-situated defendants. *Id*. at 14-15. Finally, the Government argues that Mr. Pena remains a danger to the community, as there is "a significant risk that [he] will return to fentanyl and heroin trafficking," which the

Government argues can be committed even while on home confinement through technology. *Id.* at 15-16.

The Court will address each of the relevant factors in turn.

**1. Exhaustion**

Normally, under 18 U.S.C. § 3582(c)(1)(A), a court may not modify or reduce a defendant's sentence on that defendant's motion when the defendant has not exhausted his administrative remedies by either (1) appealing a failure of the BOP to bring such a motion on the defendant's behalf or (2) the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility.

As some courts in this District have observed, "[e]ven where exhaustion is seemingly mandated by statute . . ., the requirement is not absolute." *United States v. Perez*, 451 F. Supp. 3d 288, 291 (S.D.N.Y. 2020) (quoting *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)). Moreover, "[a]lthough the Second Circuit has not addressed this issue, [d]istrict [c]ourts in this Circuit have also concluded that the Government can waive or forfeit exhaustion," interpreting the exhaustion requirement not as a jurisdictional rule, but a claims-processing rule. *United States v. Tyson*, No. 3:13-cr-002 (MPS), 2020 WL 3451694, at *2 (D. Conn. June 24, 2020) (citing *United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *4-5 (S.D.N.Y. Apr. 14, 2020) ("The exhaustion requirement in Section 3582(c) is therefore properly understood as a claim-processing rule . . . . [O]ne key consequence of the section not being jurisdictional is that the Government can waive the affirmative defense of exhaustion."); *United States v. Gonzalez*, No. 3:17-cr-00062 (JAM), 2020 WL 2079110, at *7 (D. Conn. Apr. 30, 2020) (indicating that, "if the Government decides to waive any objection to the exhaustion requirements," the Court would rule on the merits of the motion).

Neither Mr. Pena nor the Government discuss the exhaustion requirements in their briefing. The Court therefore "need not decide in this case whether [Mr. Pena] has exhausted his administrative remedies, or whether he is excused from doing so, because the Government has forfeited the issue." *Tyson*, 2020 WL 1862294, at *5.

Accordingly, as the Government has not argued that Mr. Pena failed to exhaust his administrative remedies or that exhaustion is otherwise a barrier to relief, the Court continues on to the merits of Mr. Pena's motion.

**2. Extraordinary and Compelling Reasons**

Since the outbreak of the COVID-19 pandemic, numerous courts within this Circuit have held that a defendant's pre-existing health conditions in combination with the increased risks of COVID-19 in prisons constitute "extraordinary and compelling reasons" warranting relief. *See, e.g.*, *United States v. Delgado*, 457 F. Supp. 3d 85, 89 (D. Conn. Apr. 30, 2020) (granting compassionate release where the defendant had a BMI of 40.2, finding that his "severe obesity and sleep apnea put him at increased risk should he contract COVID-19"); *United States v. Daugerdas*, -- F. Supp. 3d --, 2020 WL 2097653, at *3 (S.D.N.Y. 2020) (defendant serving a 180-month term of imprisonment and incarcerated at a facility with no reported cases of COVID-19; the district court found that his underlying health conditions—Type II diabetes, obesity, hypertension, and high cholesterol—and the risk of COVID-19 in prisons generally constituted an extraordinary and compelling reason, but did not ultimately grant compassionate release); *United States v. Morales*, No. 3:19-cr-121 (KAD), 2020 WL 2097630, at *3 (D. Conn. May 1, 2020) (slip op.) (recognizing district courts have found that "[a]sthma is a condition that places a person at increased risk for serious complications, or even death, if the person contracts COVID-19[,]" and "creates a[n] extraordinary and compelling reason for sentence reduction"); *United States v. McCarthy*, 453 F.

Supp. 3d 520, 527 (D. Conn. 2020) ("[Mr.] McCarthy is 65 years old and suffers from COPD, asthma, and other lung-related ailments . . . . The defendant's age and medical condition, taken in concert with the COVID-19 public health crisis, constitute an extraordinary and compelling reason to reduce [Mr.] McCarthy's sentence.").

Mr. Pena argues that his obesity and hypertension place him at "significantly greater risk of severe complications if he contracts COVID-19." Def.'s Mem. at 17. He argues that these conditions, coupled with evidence of numerous infections at FCI Danbury, amount to extraordinary and compelling reason for a sentence reduction. *Id*. at 19-20 (citing *United States v. Hill*, No. 3:19-cr-00038 (JAM), 2020 WL 2542725 (D. Conn. May 19, 2020)).

The Government does not dispute that Mr. Pena suffers from obesity or hypertension, or that these factors place him at greater risk of suffering severe illness should he contract COVID-19, but instead argues that "there is no indication that FCI Danbury is not able to appropriately care for and manage [his] medical conditions." Gov't Opp'n at 17.

As courts in this District have recognized, the CDC guidelines make clear that obesity places defendants at heightened risk of severe complications were they to contract COVID-19. *See, e.g.*, *United States v. Newton*, No. 3:18-cr-0022-8 (VLB), 2020 WL 6784267, at *5 (D. Conn. Nov. 18, 2020) ("The Court acknowledges that Mr. Newton's obesity, which is marginal, places him at a heightened risk of severe complications were he to contract the virus."); *United States v. Davila*, No. 16-cr-00185 (MPS), 2020 WL 6499562, at *2 (D. Conn. Nov. 5, 2020) (slip op.) ("As the Government concedes, . . . [the defendant's] obesity places him at increased risk of severe illness from COVID-19 under the CDC guidelines." (internal citation omitted)); *see also People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Feb. 3, 2021) (listing "obesity

(body mass index [BMI] of 30 kg/m2 or higher but < 40 kg/m2)" as a condition that puts "[a]dults of any age . . . at increased risk of severe illness from the virus that causes COVID-19").

As to Mr. Pena's hypertension, courts in this District, and other courts in this Circuit, have held that hypertension, combined with the COVID-19 pandemic, may constitute extraordinary and compelling reasons for release, especially when accompanied by other medical conditions. *See United States v. Sedge*, No. 16-cr-537 (KAM), 2020 WL 2475071, at *3 (E.D.N.Y. May 13, 2020) ("Given that the defendant is over 50 and has demonstrated existing medical conditions that would place him into a high-risk category including hypertension, hyperlipidemia, and coronary artery disease, defendant has demonstrated that he is at a higher risk for suffering life threatening complications from COVID-19."); *United States v. Pena*, 459 F. Supp. 3d 544, No. 15-cr-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (defendant had hypertension and hyperlipidemia, and the district court recognized the heightened risk hypertension poses); *United States v. Scparta*, -- F. Supp. 3d --, No. 18-cr-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) (defendant suffered from "hypertension, sleep apnea, high blood pressure, and high cholesterol" and the court recognized that the CDC "has identified hypertension as a comorbidity that increase the likelihood of serious risk from COVID-19"); *United States v. Sawicz*, 453 F. Supp. 3d 601, 605 (E.D.N.Y. 2020) (finding that, where a defendant suffered only from hypertension, "the COVID-19 pandemic, combined with [the defendant's] particular vulnerability to complications from COVID-19 . . . constitutes an 'extraordinary and compelling reason' for his release"). Additionally, this Court has, and at least several other courts have, granted compassionate release to defendants with on the basis of hypertension alone. *See, e.g.*, *United States v. Chesney*, No. 3:18-cr-257 (VAB), ECF No. 53 at 6 (D. Conn. May. 20, 2020) ("Ms. Chesney's hypertension places her in a higher risk category for COVID-19 complications, should

she contract the virus."); *United States v. Salvagno*, 456 F. Supp. 3d 420, 433, 446 (N.D.N.Y. 2020) (finding on reconsideration that the court did not err in granting compassionate release where the movant's hypertension was "mild" and "controlled," and the movant did not have "pulmonary hypertension," because of the "well-established correlation between hypertension and severe manifestations of COVID-19, and the substantial chorus of experts who have found that there is a causal relationship"); *United States v. Robinson*, No. 3:10-cr-261, 2020 WL 4041436, at *5 (E.D. Va. July 17, 2020) (rejecting the Government's argument that the movant's hypertension was "controlled").

Also relevant to the Court's inquiry is the status of COVID-19 infections at FCI Danbury. *See United States v. Colon*, No. 3:17-cr-48 (SRU), 2020 WL 6049215, at *7 (D. Conn. Oct. 12, 2020) (observing that "in determining whether 'extraordinary and compelling reasons' warrant a prisoner's early release, courts routinely consider the status of coronavirus infections at the particular institution where the defendant is housed," and collecting cases). While there are currently two active inmate cases at FCI Danbury, and the Government has thoroughly explained infection control procedures in place at the facility,[3] *see* Gov't Suppl. Opp'n at 2-3, 186 inmates – over one-quarter of FCI Danbury's total inmate population – have contracted and recovered from COVID-19 over the course of the pandemic, and one inmate has died. *See* Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed Feb. 9, 2021) (also noting that 80 staff members had contracted and recovered from the virus); Bureau of Prisons, *Population Statistics*, https://www.bop.gov/mobile/about/population_statistics.jsp (last accessed

[3] While the Government also represents that FCI Danbury has begun to vaccinate its staff and has provided 78 inmates the first dose of the vaccine, and has identified priority levels in which the facility will continue to administer the vaccine to its population, *see* Gov't Suppl. Mem. at 3, the Government does not represent when FCI Danbury believes it will be able to vaccinate Mr. Pena or others in his priority tier.

Feb. 9, 2021) (showing FCI Danbury has a population of 657 inmates). And as recently as several weeks before the date of this Order, with only one active inmate case at FCI Danbury, at least one district court has granted compassionate release to a defendant in custody there, "conclud[ing] that, in tandem, the difficulty of maintaining effective social distancing in the prison setting combined with the presence of COVID-19 in FCI Danbury favors releasing [the defendant]." *United States v. Doe*, No. 1:17-cr-00091-JAW-1, 2020 WL 231209 (D. Me. Jan. 22, 2021) (slip op.).

While the Court agrees with other courts in this District that, standing alone, "the [current] COVID-19 case count at FCI Danbury does not establish an 'extraordinary and compelling' reason warranting [Mr. Pena]'s release," *United States v. Petersen*, No. 3:16-cr-109 (SRU), 2021 WL 217425, at * (D. Conn. Jan. 21, 2021) (slip op.), the Court does not find that the current low level of COVID-19 cases at FCI Danbury outweighs the risks Mr. Pena's obesity and hypertension present should he contract the virus.

Accordingly, the Court finds that extraordinary and compelling reasons exist to warrant Mr. Pena's release. The Court therefore turns to the Section 3553(a) factors.

**3. Section 3553(a) Factors**

After establishing that extraordinary and compelling reasons exist, "Section 1B1.13 of the Guidelines further provides that a court may reduce a term of imprisonment only if the court determines that '[t]he defendant is not a danger to the safety of any other person or to the community[,]'[ ] and only after considering the factors listed in 18 U.S.C. [§] 3553(a)." *McCarthy*, 453 F. Supp. 3d at 526.

Mr. Pena argues that "the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic, the serious risk it presents to a person in [Mr.] Pena's condition, the harsh conditions he has faced, and the fact that programming has either been

precluded or limited." Def.'s Mem. at 18. He argues that his up-to-date history and characteristics reflect his rehabilitation and support his reduced sentence, and that his "conduct while in prison," including his absence of disciplinary infractions while in custody, his completion of several courses, including "Adjustment to Incarceration, Healthy Relationships and Anger Management & Substance Abuse Awareness," "helps to establish that the purposes of punishment have been adequately met." *Id.* at 20-21. He argues that he has "served the majority of his sentence," and that "ordering [him] to spend an additional year or a little more in prison or a halfway house, on top of the time he has already served, will [not] help if the goal is his successful reintegration into society," and "suggest[s] that after this time in prison under very harsh conditions without disciplinary incident, structured supervision will be enough." *Id.* at 24. He argues that it is "difficult to articulate a reasoned principle which would suggest that his sentence has not had a deterrent effect to this point but would if he served another year." Def.'s Suppl. Mem. at 3.

The Government argues that the nature and circumstances of the offense "strongly support[] [Mr.] Pena serving his full federal sentence." Gov't Opp'n at 9. The Government argues that Mr. Pena was "involved in importing into Connecticut, and selling for profit within Connecticut, extraordinary quantities of fentanyl and heroin – two incredibly addictive, destructive and deadly opioids"; that he "was involved in [the] conspiracy on a day-to-day basis over an extensive time[] period, despite being on federal supervised release"; and "illegally possessed a firearm, ammunition and narcotics at his residence . . . despite being on federal supervision." Gov't Suppl. Opp'n at 4. The Government argues that this "extremely serious criminal conduct" warrants "[a] significant prison sentence . . . to reflect the seriousness of the [crimes], as well as to promote respect for the law and provide just punishment for the offense." Gov't Opp'n at 12.

The Government also argues that Mr. Pena's history and characteristics, including his

criminal history and, particularly, the fact that he committed the underlying offense while on federal supervised release, weigh against a sentence reduction. *Id*. at 13-14. The Government also argues that the fact that Mr. Pena received a below-Guidelines sentence weighs against release, as any "further reduction would be inconsistent with, and undermine, the sentencing factors" under § 3553(a). *Id*. at 14. Finally, the Government argues that Mr. Pena "has failed to demonstrate that he is not a danger to the safety of the community," as the extent of the drug conspiracy in which Mr. Pena was involved included "incredibly dangerous criminal conduct," and "[t]here is a significant risk that [he] will return to fentanyl and heroin trafficking," even if on home incarceration. *Id*. at 15-16.

On balance – though the Government raises legitimate concerns – the Court disagrees.

"Courts have found during the coronavirus pandemic that, even where an individual has medical conditions which make him vulnerable to COVID-19, the individual's danger to the community may ultimately outweigh any health concerns and the balance of factors would weigh against release." *United States v. Belle*, 457 F. Supp. 3d 134, 140 (D. Conn. May 5, 2020) (collecting cases). The Court recognizes that Mr. Pena has a prior criminal history and has previously violated conditions of supervised release. *See* PSR ¶¶ 36-43; Gov't Opp'n at 2, 13. The Court also recognizes that the nature of the underlying offense, involving a large-scale drug conspiracy of which Mr. Pena was a part, is undoubtedly serious. Because the "nature and circumstances" of Mr. Pena's crimes, particularly his crime of conviction, are "undoubtedly serious, [this] 'may weigh against granting compassionate release.'" *United States v. De La Cruz*, No. 3:17-cr-150 (VAB), 2020 WL 6193891, at *6 (D. Conn. Oct. 22, 2020) (slip op.) (internal quotation marks omitted) (quoting *United States v. Goins*, No. 11-cr-20376, 2020 WL 3064452, at *6 (E.D. Mich. June 9, 2020)).

Other factors, however, weigh in favor of release, even if ever so slightly.

On the record before the Court, Mr. Pena has received no disciplinary tickets over his nearly four years in pretrial detention and federal custody. *See* Def.'s Mem. at 21 (citing PSR ¶ 9). This blemish-free record, coupled with Mr. Pena's comprehensive record of prison classes and participation in a drug rehabilitation program, *see id.* at 20-21, indicates a "positive behavioral trend" that weighs in favor of release. *United States v. Johnson*, No. 3:18-cr-162 (MPS), 2020 WL 4449797, at *4 (D. Conn. Aug. 3, 2020) (slip op.) (granting compassionate release where the defendant had "not had any disciplinary incidents [in pretrial detention] or in BOP custody" despite a lengthy criminal history); *United States v. Pena*, 459 F. Supp. 3d 544, 552 (D. Conn. 2020) (granting compassionate release where the defendant's "conduct since the crime," including "compli[ance] with the requirements of home detention and electronic monitoring" and having "not received a *single* disciplinary infraction while in custody over the past five years," helped "convince the Court . . . that he does not now pose a danger to the community").

Mr. Pena also is scheduled to be released on September 2, 2022, and likely would be eligible for a halfway house placement significantly sooner, if he continued participation in the RDAP program. Def.'s Suppl. Mem. at 3; *see* Bureau of Prisons, Inmate Locator, https://www.bop.gov/inmateloc/ (last accessed Feb. 9, 2021). The significant amount of time Mr. Pena has already spent in custody, as compared to the amount of time remaining on his sentence, also weighs in favor of release from a deterrence perspective. *See De La Cruz*, 2020 WL 6193891, at *6 (citing *United States v. Morales*, No. 3:12-cr-164 (JBA), 2020 WL 5369198, at *6 (D. Conn. Sept. 8, 2020) (slip op.) (granting compassionate release to a defendant who had served over half of his prison sentence)). Indeed, the Court agrees with Mr. Pena's argument that "it is difficult to articulate a reasoned principle which would suggest that his sentence has not had a deterrent effect

to this point," but would have if he served the relatively minimal time remaining on his sentence. Def.'s Suppl. Mem. at 3.

Mr. Pena's presentence report also notes that he would benefit from various forms of programming, *see* PSR ¶¶ 102, programs which have apparently not been available to Mr. Pena since he has been BOP custody, *see* Def.'s Mem. at 22 n.45. While not at all preferable, the challenging circumstances of the day (a raging pandemic and serious health risks to an inmate), and the absence of meaningful programming for possibly the duration of the term of incarceration, make release the lesser of two undesirable options. If released to home confinement, Mr. Pena will be able to receive the substance abuse treatment and testing mandated as a condition of supervised release set forth in his 2020 Judgment. *See* J. at 5.

Therefore, "[a]lthough his criminal history [may] suggest[] that there is no guarantee that Mr. [Pena] will no longer be a danger to any other person or the community," the Court finds that the factors discussed above, as well as "the possible reinstatement of a . . . term of incarceration for a violation of conditions of supervised release, coupled with the threat of the coronavirus, provides a sufficient basis" to warrant release. *United States v. Holmes*, No. 3:19-cr-87 (VAB), 2020 WL 4355118, at *4 (D. Conn. June 3, 2020) (slip op.).

Accordingly, having considered all of these factors as well as those set forth in 18 U.S.C. § 3553(a), the Court concludes that they weigh in favor of immediate release.[4]

## IV. CONCLUSION

For the reasons explained above, the motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is **GRANTED**. Mr. Pena's term of imprisonment is reduced to **TIME SERVED**.

[4] This Order applies with equal force and reduces to time served both the 75-month sentence imposed in Mr. Pena's underlying criminal case, No. 3:17-cr-00150 (VAB), and the 12-month sentence imposed for Mr. Pena's violation of supervised release in the companion docket, No. 3:16-cr-171 (VAB).

It is **ORDERED** that Mr. Pena be released from Bureau of Prisons custody by **February 12, 2021**, to begin his four (4)-year term of supervised release, to be served on home incarceration at the home of Venecia Arcequis, monitored by technology deemed appropriate by the U.S. Probation Office, for thirty (30) days, after which, if successfully completed, he may be eligible for home detention or curfew, until his release date on **September 2, 2022**. All other conditions of release from his March 10, 2020 Judgment shall remain in effect, including but not limited to participating in inpatient or outpatient substance abuse treatment and testing, as directed by the U.S. Probation Office.

Upon release, Mr. Pena shall get tested for COVID-19, and then self-quarantine for fourteen (14) days, regardless of the results, unless a positive test result requires another course of treatment, as directed by medical professionals. If the test is positive, he shall promptly report that result to the Bureau of Prisons.

Mr. Pena is ordered to remain strictly on home incarceration, without work privileges, for thirty (30) days following his release, as to be supervised by the U.S. Probation Office. Following the expiration of the thirty-day time period, Mr. Pena may move the Court for modification of his conditions of supervised release.

**SO ORDERED** at Bridgeport, Connecticut, this 9th day of February, 2021.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge